# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RB RUBBER PRODUCTS, INC., individually and on behalf of all those similarly situated, 904 NE 10th Avenue McMinnville OR 97128 | ) ) ) ) | |
| Plaintiff, | ) ) ) ) | Case No. _____ CLASS ACTION COMPLAINT FOR ANTITRUST VIOLATION |
| v. | ) ) | |
| NORFOLK SOUTHERN RAILWAY COMPANY, Three Commercial Place Norfolk VA 23410 | ) ) ) ) | |
| CSX TRANSPORTATION, INC., 500 Water Street Jacksonville FL 32202 | ) ) ) ) | DEMAND FOR JURY TRIAL |
| UNION PACIFIC RAILROAD COMPANY, 1400 Douglas Street Omaha NE 68179 | ) ) ) ) | |
| BNSF RAILWAY COMPANY, 2650 Lou Menk Drive Fort Worth TX 76131 | ) ) ) ) | |
| KANSAS CITY SOUTHERN RAILWAY CO., 426 West 12th Street Kansas City MO 64105 | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, RB Rubber Products, Inc., individually and on behalf of a class of all those similarly situated, brings this action for treble damages under the antitrust laws of the United States against Defendants, and alleges as follows:

**Nature of the Action**

1.      This class action alleges that the Class-I railroad companies unlawfully engaged in horizontal price-fixing through the use fuel surcharges in violation of Section 1 of the Sherman Antitrust Act of 1890 (the "Sherman Act"), 15 U.S.C. § 1. Plaintiff seeks treble damages pursuant to Section 1 of the Sherman Act and Section 4 of the Clayton Act of 1914 (the "Clayton Act"), 15 U.S.C. § 15.

2.      Plaintiff brings this class action on behalf itself and all other similarly situated direct purchasers of unregulated—i.e., rail freight transportation services at rates agreed upon by private contract or through other means exempt from federal regulation—freight rail transportation services from Defendants and their co-conspirators from July 1, 2003 to the present (the "Class Period") and who were charged a fuel surcharge (the "Class").

3.      During the Class Period Defendants conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States through a fuel surcharge ("Rail Fuel Surcharge") separate line item add-on to customer billing invoices.

**The Parties**

4.      Plaintiff RB Rubber Products, Inc. ("RB Rubber") is, and at all relevant times has been, a Oregon corporation with its principal place of business at 904 NE 10th Avenue, McMinnville, Oregon 91728, engaged in the business of manufacturing and distributing durable rubber mats and other protective surfaces and products made from recycled tires.

2

5.     Defendant Norfolk Southern Railway Company ("NS") is, and at all relevant times have been, a Virginia corporation with its principal place of business at Three Commercial Place, Norfolk, Virginia 23510, engaged in the business of transporting freight by rail.  NS operates an intermodel terminal at 100 South Vandom Street, Washington DC 20001 within the District, and maintains a government relations office at 1500 K Street, NW, Suite 375, Washington DC 20005, in this District.

6.     Defendant CSX Transportation, Inc. ("CSX") is, and at all relevant times has been, a Virginia corporation with its principal place of business at 500 Water Street, Jacksonville, Florida 32202, and maintains a government relations office at 1331 Pennsylvania Avenue, NW, Suite 560, Washington DC 20004, in the District.

7.     Defendant Union Pacific Railroad Company ("UP") is, and at all relevant times has been, a Utah corporation with its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179, registered to do business in the State of Illinois, engaged in the business of transporting freight by rail.  UP maintains an office at 600 13th Street, NW, Suite 340, Washington DC 20005, in the District.

8.     Defendant BNSF Railway Company ("BNSF") is, and at all relevant times has been, a Delaware corporation with its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131, engaged in the business of transporting freight by rail.  BNSF maintains a government relations office at 500 New Jersey Avenue, NW, Suite 550, Washington DC 20001, in the District.

9.     Defendant Kansas City Southern Railway Company ("KCS") is, and at all relevant times has been, a Missouri corporation with its principal place of business at 427

W. 12th Street, Kansas City, Missouri 64105, engaged in the business of transporting freight by rail. KCS interchanges rail traffic within the District.

## Jurisdiction and Venue

10. This is an action is brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys fees from Defendants for the injury sustained by Plaintiff and members of the Class for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11. This Court has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1331 and 1337.

12. Venue is proper in this judicial district pursuant to 15 U.S.C. § 15(a) and 22, and 28 U.S.C. § 1391 because Defendants are corporations which maintain rail yards an/or offices, have agents, transact business, and are found within this District, are subject to personal jurisdiction in this District at the time the action is commenced, and because the acts upon which the suit is premised substantially occurred in this District.

13. This Court has personal jurisdiction over each Defendant because each has (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to entities residing in, located in, or doing business in this District.

## Class Action Allegations

14.    Plaintiff requests that this Court certify the following Class under Rule 23, Fed. R. Civ. P. 23, of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated:

> All purchasers of rail freight transportation services from Defendants, through the use of private railroad-shippers contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a "Rail Fuel Surcharge" at any time from July 1, 2003 to the present. Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators whether or not named in this action.

15.    Certification of this class is appropriate pursuant to Rule 23(b)(1), Fed. R. Civ. P. 23(b)(1), because there is a risk that the prosecution of separate actions could establish incompatible standards of conduct for Defendants' assessment and collection of Rail Fuel Surcharges from their customers.

16.    Certification of this class is also appropriate pursuant to Rule 23(b)(2), Fed. R. Civ. P. 23(b)(2), because in assessing and collecting Rail Fuel Surcharges from their customers Defendants have acted or refused to act on grounds generally applicable to the class making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

17.    Certification of this class is also appropriate under Rule 23(b)(3), Fed. R. Civ. P. 23(b)(3), because there are predominant common questions of fact and law as to whether Defendants' conspired to fix, maintain and standardize Rail Fuel Surcharges.

18.    The Class is so numerous and the nature of the commerce involved is so geographically dispersed throughout the United States and globally that joinder of all members is impracticable.  While the exact number of Class members is unknown to

Plaintiff as this time, based upon information to be confirmed through discovery, the Class consists of thousands of members.

19.    Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and all members of the Class purchased unregulated rail freight transportation services from Defendants and their co-conspirators, with respect to which Defendants and their co-conspirators imposed artificially inflated Rail Fuel Surcharges established and maintained by Defendants' illegal horizontal price-fixing scheme alleged herein.  Plaintiff and members of the Class have all sustained damage in that they paid inflated prices for unregulated rail freight transportation services as result of Defendants' illegal price-fixing scheme

20.    There are common questions of law and fact which predominate over any questions affecting individual members of the Class.  The common questions of law and fact include, among others:

    i.    Whether Defendants conspired, contracted or combined with others for the purpose of and with the effect of raising, fixing, maintaining, or stabilizing the price of unregulated rail freight transportation services purchased by Class members through the Rail Fuel Surcharge;

    ii.    Whether Defendants took actions to conceal the unlawful conspiracies, contracts or combinations; and

    iii.    Whether Defendants' conduct violated federal antitrust laws and caused injury to Plaintiff's and the Class members' property and business, and if so, the proper measure of damages.

6

21. Plaintiff will fairly and adequately represent the interests of the members of the class. Their interests are the same as, and not in conflict with, the other members of the class. Plaintiff's counsel is experienced in and competent to handle class actions and complex litigation of this type.

22. A class action is superior to other available litigation methods for the fair and efficient adjudication of this controversy, as joinder of all members of the class is impracticable. Furthermore, many class members injured by Defendants' conduct will not be compensated for their injuries in the absence of a class action since it is too expensive for many individual members to prosecute this litigation. Even if individual class members could afford to prosecute this litigation alone, individual litigation magnifies the delay and expense to all parties and to the court system of resolving the controversies engendered by the Defendants' conduct. By contrast, a class action presents fewer management difficulties and provides the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

### Interstate Trade and Commerce

23. During the Class Period, Defendants conducted approximately 90% of all rail freight transportation—approximately $51 billion in 2006—in the United States, and approximately 80% of that was unregulated rail freight transportation.

24. The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce and international trade. During the Class Period, Defendants and their co-conspirators sold and carried rail freight in a continuous and uninterrupted flow of interstate and foreign commerce from shippers to customers throughout the United States. Each Defendant and their co-conspirators used

7

instruments of interstate commerce or foreign commerce or both to sell, market, and move rail freight services.

25.    The unlawful activities of Defendants and their co-conspirators, named and unnamed, have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## Allegations of Fact

26.    Prior to 1980 the Interstate Commerce Commission (the "ICC") prohibited rail companies from charging different rates than those contain in published tariffs filed by the railroads with the ICC.  In 1980, Congress deregulated the rail industry with passage of the Staggers Act allowing each rail company to set its own market rates for the majority of the market.  The Surface Transportation Board (the "STB") which succeeded the ICC, continues to regulate some single-server markets, but approximately 80% of the all rail shipments in the United States are exempt from rate regulation and move under private contracts.

27.    By the early 2000s the rail industry had consolidated to from thirty-five major railroads in 1980 to seven Class I railroads—the five United States-based Defendants and two Canadian-based unnamed co-conspirators.  Class I railroads are defined as rail companies with annual revenues in excess of $250 million 1991 dollars (roughly $320 million 2005 dollars adjusted for inflation).  Responding to concerns about further consolidation, the STB issued a moratorium on mergers and promulgated more stringent rules for reviewing proposed mergers stabilizing the industry to its current major players.

28.  The rail industry is now highly concentrated and has very high barriers of entry.

29.  Since the passage of the Staggers Act, the rail companies have increasingly entered into private contracts with cost escalation provisions tied to the "Rail Cost Adjustment Factor" (the "RCAF"). The RCAF was published by the Association of American Railroads (the "AAR"), the industry trade association funded and controlled by the Class I rail companies. Until late 2002, the RCAF included fuel price as a component of the index.

30.  In the fourth quarter of 2002, the AAR first published the RCAF "without fuel," i.e., it published the cost escalation index without fuel as a component. The decision to remove fuel as a component of the RCAF was deliberate and set the stage for Defendants' price-fixing conspiracy because, for the first time, Defendants and their co-conspirators were free to assess and collect fuel surcharges independent of the cost escalation index.

31.  Defendants began applying a Rail Fuel Surcharge as a separate line item add-on to their customers' shipping invoices and collecting the Rail Fuel Surcharges from their customers.

32.  In late 2003 and early 2004, the price of crude oil, and therefore the price of all products refined from crude oil, began to significantly rise. As a result, it became common place for various users of oil products to seek recovery of the incremental price increase through the use of fuel surcharges.

33.  About March 2003, the top executives of the Defendant rail companies and their co-conspirators met in the Greenbrier Resort in West Virginia (owned by Defendant

CSX) for the spring 2003 National Freight Transportation Association ("NFTA") meeting.

34.    The NFTA provides a forum for transportation executives of industrial firms and transportation companies to consider and discuss various developments affecting the transportation industry.    NFTA meetings facilitate the development of personal and business relationships among the attendees.

35.    The spring 2003 NFTA meeting provided Defendants' top executives numerous formal and informal opportunities to discuss and agree upon the specifics of the Rail Fuel Surcharge changes which were implemented lock-step about July 2003.

36.    The key element to Defendants' price-fixing conspiracy was an agreement by the Defendant rail companies to act in concert with one another in assessing Rail Fuel Surcharges against shippers and by agreeing to compute and apply Rail Fuel Surcharges as a percentage of the base rail freight, i.e. revenue, paid by their customers rather than as a percentage of the actual incremental cost of fuel consumption associated with the individual shipper's shipment..

37.    The revenue-based fuel surcharges implemented by Defendants in or about July 2003, or earlier, had no direct relationship to the actual incremental increase in fuel.

38.    One study, *Analysis of Rail Fuel Surcharges During the Period 2003-2007: A Report to The American Chemistry Counsel*, issued in July 2007, shows that the Defendants collected over $6 billion in Rail Fuel Surcharges in excess of the actual incremental increased cost of fuel.

39.    Defendants have acknowledged that their Rail Fuel Surcharges bore no direct relationship to Defendants' actual incremental increase in fuel costs, but were in

fact revenue enhancement measures intend to achieve increases in the prices charged by Defendants for the transportation of unregulated freight without increasing their base freight rate.

40.   Defendants implemented, monitored and enforced their agreement, contract, combination, or conspiracy to horizontally price-fix through Rail Fuel Surcharges by privately and publicly exchanging information and announcements of agreed-upon Rail Fuel Surcharges and posting the monthly Rail Fuel Surcharge as percentages of the total bill on their websites.

41.   As a result of Defendants' concerted action, the price levels of Rail Fuel Surcharges charged to and collected from Plaintiff and Class members were raised to or maintained at non-competitive levels throughout the Class Period.

42.   Defendants began to implement their contract, combination, conspiracy as early as June 2003 when the two western railroads, Defendants UP and BNSF (the "Western Railroads"), agreed to coordinate their prices relative to the Rail Fuel Surcharges each would charge.   Prior to June 2003, the UP adjusted its carload fuel surcharge monthly based on the West Texas Intermediate Crude Oil Index ("WTI").   The BNSF adjusted its carload fuel surcharge less frequently based on the US Department of Energy's On-Highway Diesel Fuel Price Index ("HDF").

43.   In or about June 2003 the Defendant UP switched from using the WTI to the using the HDF pursuant to an agreement with Defendant BNSF.   The choice to use the HDF was arbitrary in that the Western Railroads chose to use it; they were not required to use it.   From that point forward, the Western Railroads moved the Rail Fuel Surcharges

they charged the Class in lock-step charging the exact same percentage of the total bill as their Rail Fuel Surcharge for each month of the Class Period.

44. The Western Railroads agreed to administer the HDF Index in precisely the same manner: No fuel surcharge was applied when the US average price of diesel fuel as measured by the HDF was lower than or equal to $1.35 per gallon, and both applied a surcharge of 0.5% for every nickel increase of the cost of fuel above $1.35 per gallon. For example, if the HDF price was $1.55 per gallon, then Rail Fuel Surcharge would be 2% of the base freight rate. The Rail Fuel Surcharge would be increase 2% for every 20 cents increase in the HDF price. The choice to set the trigger point at $1.35 per gallon was also arbitrary, and done pursuant to the agreement, in that the Western Railroads chose to use it; they were not required to set it at this level.

45. The Western Railroads also agreed and coordinated the timing of the application of the Rail Fuel Surcharges agreeing that the Rail Fuel Surcharges would apply to shipments beginning the second month after the month in which there was a change in the HDF average price calculation. For example, if the HDF price changed in January, then the Western Railroads would announce a change in the Rail Fuel Surcharge rate on February 1 and implement it on March 1.

46. The fact that the Western Railroads (1) chose the same fuel index, (2) set the same trigger point, (3) set the same formula, (4) did so at the same time; and (5) announced and implemented changes in the Rail Fuel Surcharge in the same manner are evidence that they coordinated their activities.

47. The Western Railroads moved their Rail Fuel Surcharge price levels in lock-step from July 2003 throughout the Class Period.

48. Defendants CSX and NS, located in the eastern states, began to implement the conspiracy in February 2004 or earlier, and KCS, located in the Midwestern states, agreed to join the conspiracy in June 2005 or earlier (collectively, the "Eastern Railroads").

49. The Eastern Railroads all agreed to base their fuel surcharge programs on the average monthly price of the WTI as published in the *Wall Street Journal*.

50. The choice to use the WTI was arbitrary in that the Eastern Railroads chose to use it; they were not required to use it. Once they joined the conspiracy, the Eastern Railroads adjusted the Rail Fuel Surcharges they charged the Class in lock-step charging the exact same percentage of the total bill as their Rail Fuel Surcharge for each month of the Class Period.

51. The Eastern Railroads agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. Defendants administer the WTI Index in precisely the same manner: No fuel surcharge was applied when the WTI Index was less than or equal to $23 per barrel, and all applied a surcharge of 0.4% for every $1 that the WTI price exceeded $23 per barrel. For example, if the WTI price was $28 per barrel, then Rail Fuel Surcharge would be 2% of the base freight rate. The Rail Fuel Surcharge would be adjusted upward at 2% for every $5 increase in the WTI price. The choice to set the trigger point at $23 per barrel was also arbitrary, and done pursuant to the agreement, in that the Eastern Railroads chose to use it; they were not required to set it at this level.

52. The Eastern Railroads also agreed and coordinated the timing of the application of the Rail Fuel Surcharges agreeing that the Rail Fuel Surcharges would

apply to shipments beginning two months after the WTI price adjusted, thereby adopting the same pricing timing implemented by the Western Railroads.

53.    The fact that the Eastern Railroads (1) chose the same fuel index, (2) set the same trigger point, (3) set the same formula, (4) did so at the same time, and (5) announced and implemented changes in the Rail Fuel Surcharge in the same manner are evidence that they coordinated their activities.

54.    The Eastern Railroads moved their Rail Fuel Surcharge price levels in lock-step for most of the Class Period.    Although Defendant KCS used different fuel surcharge percentages for certain months of the Class Period, in June 2005 it adopted the same fuel surcharge percentage as Defendants CSX and NS, and moved in lock-step thereafter.

55.    In stark contrast to the uniformity among the Defendants' fuel surcharge percentages, fuel costs as operating costs and fuel efficiency differed widely among the Defendant railroads.    Absent conspiracy and collusion, it is highly unlikely that Defendants in both the west and east would independently price their Rail Fuel Surcharges to arrive at the identical percentage month after month for a period of more than three years.    The fact that Defendants moved their Rail Fuel Surcharge prices in lock-step for a more than 36 months is indicative of Defendant coordination and conspiracy to horizontally price-fix.    In a competitive environment, free of collusion, the Defendant railroads with lower fuel costs would impose a lower surcharge in order to obtain a competitive advantage.

56.    On January 25, 2007, the STB issued an administrative decision concluding that the Defendants' practice of computing Rail Fuel Surcharges as a percentage of the

base freight weight for regulated rail transportation was an unreasonable practice because the fuel surcharges are not tied to the fuel consumption associated with the individual shipments to which they applied. Rail Fuel Surcharges, STB Ex Parte No. 661 (Jan. 25, 2007)

57.    The STB found that Defendants had been "double-dipping"—applying both a Rail Fuel Surcharge and a rate increase based upon the RCAF or other index which included a fuel cost component.

58.    The STB ordered Defendants to change these practices with respect to the approximately 20% of all rail traffic which was within its purview and which it regulated and which is not subject to this Complaint. The STB stated that its order does not affect the approximately 80% of all other rail traffic exempt from its regulation.

### Allegations of "Plus Factors"

59.    Apart from the direct evidence of price-fixing, "plus factors" further support the allegations that Defendants agreed to horizontally price-fix prices for Rail Fuel Surcharges. The rail transportation industry is marked by certain structural and other characteristics that make a price-fixing cartel feasible:

    (a)    The railroad industry is highly concentrated. Defendants in this
           case are the five remaining domestic Class I railroads following
           decades of mergers and consolidation. Defendants account for
           approximately 90% of the nation's rail traffic. Such high
           concentration facilitates the possibility of a price-fixing cartel.

    (b)    There are significant barriers to entry in the railroad industry. To
           compete, railroads must invest in vast networks of tracks, yards,

and switching facilities.    This infrastructure takes decades to develop, and require onerous regulatory and environmental reviews and approval.    Land and easements are needed, necessitating involvement of multiple local and regional governments and the exercise of eminent domain.    Because railroad infrastructure is of minimal value for other purposes, and the track networks are difficult to assemble, the fixed costs are largely sunk creating significant barriers of entry.    Entry also requires that a new entrant acquire sufficient market share from the existing carriers to survive.

(c)    Rail Fuel Surcharges, when computed as a percentage of the revenue, are easily standardized.    Defendants structured their Rail Fuel Surcharges as a percentage of their base freight rates and then published those Rail Fuel Surcharges on their websites so that colluding railroads could monitor and police the cartel without frequent communication.    It is well-recognized that markets having uniform and homogenous products or services are susceptible to price-fixing.

(d)    The railroad industry has a history of price fixing and other anti-competitive behavior.    In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or face bankruptcy.    Later, prior to deregulation in the

1980s, railroads engaged in open price-fixing through the establishment of "rate bureaus" and "rate making committees." After the passage of the Staggers Act, the railroads have continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

(e)     The chief executive officers of the Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership is limited to the seven Class I railroads—Defendants plus the two Canadian railroads—operating in the United States, however, not the entire North American rail industry. The AAR Board meets regularly and board members and their staff regularly communicate between meetings facilitating the coordination of prices.

(f)     Unlike most industries, the railroad industry has standardized equipment and industry operating and safety rules, and interchanges cars and engines among the Class I railroads. In addition, operating practices often involve operating employees of one railroad closely interacting with operating employees of others due to the use of trackage rights, common dispatching of trains, and close communication with operating crews. All of this creates

a climate of great knowledge of detailed operating practices by each railroad of the others.

60.   Apart from these structural market features, Defendants did not behave as if they operated in a competitive market.  Shippers from many different industries with significant economic power have tried to negotiate the fuel surcharges percentages, but were told by Defendants that the Rail Fuel Surcharges were non-negotiable.

61.   Several national shipping organizations also met with and requested Defendants to examine the Rail Fuel Surcharge methodology.  Only Defendant BNSF agreed to make responsive changes to its fuel surcharge program, and only for grain and coal shipment coming from certain regions where the BNSF is the only rail carrier.  The remaining Defendants refuse to address the shipping organizations' concerns.

62.   At or about the time that Defendant agreed to fix the Rail Fuel Surcharge prices they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly, or monthly.  Previously Defendants had negotiated long term contracts ranging up to five years with terms that did not permit rate increases beyond certain levels or that excluded fuel surcharges altogether.

63.   Defendants discontinued offering "through rates"—where a shipper receives a single bill for either the originating shipper or the terminal shipper—which allowed for only a single Rail Fuel Surcharge to "Rule 11 pricing"—where a shipper receives a bill from each carrier which carries its freight.  This allows each railroad to apply the agreed upon Rail Fuel Surcharge in its own territory.

64. Finally, demand for railroad freight transportation services grew substantially during the period of the conspiracy, yet Defendants' market shares remained relatively stable. This is indicative of anti-competitive behavior in the market.

## Defendants Profited From the Rail Fuel Surcharges

65. Because fuel surcharges are described by Defendants as assessed to recover the incremental increase in fuel costs, they should bear a relatively constant relationship to the actual cost of fuel associated with the individual shipments to which they are applied. Since the beginning of the Class Period and before, however, Defendants have used the Rail Fuel Surcharges not as cost-recovery mechanism, but as a revenue enhancement mechanism.

66. Defendants' profited as a result of the concerted implementation and maintenance of the agreed-upon Rail Fuel Surcharge realizing billions of dollars in revenue during the Class Period in excess of their actual incremental increase in fuel costs from Plaintiff and the Class members.

## Antitrust Injury to Plaintiff and the Class

67. The unlawful conduct, combination, or conspiracy alleged herein had and is having the following effects, among others:

(a)    The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated freight transportation have been fixed or stabilized at non-competitive levels;

(b)    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

(c)    Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, or eliminated.

68.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the Class members have sustained injury to their business or property.    The injury sustained by Plaintiff and the Class is the payment of non-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged herein.

## CLAIM FOR RELIEF

### COUNT I

(Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)

69.    Plaintiff incorporates by reference the allegations in the paragraphs above in this Count.

70.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

71.    The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other mean exempt from regulation.    Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

72.    Defendants' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected, interstate commerce.

73.    Defendants' unlawful conduct was through mutual undertakings or agreements by, and between, and among Defendants.

74.    Defendants' contract, combination, or conspiracy had the following effects:

(a)    Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at non-competitive levels;

(b)    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

(c)    Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

75.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury, and suffered damges in that they have paid non-competitive prices for Rail Fuel Surcharges applied to unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff and the Class pray for the following relief:

1.    Certification of this action as a class action with the class defined as set out above;

2.    A finding that Defendants' contract, combination, and conspiracy as alleged in Count I is an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

3.    Judgment against Defendants for compensatory damages, as provided by law, determined to have been sustained by Plaintiffs and the Class;

4.    A permanent injunction preventing Defendants and their respective officers, directors, agents, employees, and others acting on their behalf from directly or indirectly continuing or maintaining the unlawful contract, combination, or conspiracy alleged above;

5.    Judgment for treble damages, as provided by law;

6.    Creation of a common fund equal to the amount due to be refunded to Plaintiff and the Class;

7.    Pre- and post-judgment interest;

8.    Attorneys' fee and costs pursuant to the common fund/benefit doctrine or any other applicable law; and

9.    Any other and further relief as the Court deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable herein.

Dated:  December 17, 2007

ASHCRAFT & GEREL LLP

Michelle A. Parfitt, Esq.  #358592

2000 L Street, N.W., Suite 400
Washington DC 20036
Telephone (202) 783-6400
Fax (202) 416-6392
Email: mparf@aol.com

Counsel for Plaintiff
RB Rubber Products, Inc.

and

SCHLICHTER, BOGARD & DENTON LLP
Matthew H. Armstrong
D.C. Bar No. 974272
Jerome J. Schlichter
Roger C. Denton
100 S. Fourth Street, Suite 900
Saint Louis MO 63102
Tel  314-621-6115
Fax 314-621-5171
marmstrong@uselaws.com
jschlichter@uselaws.com
rdenton@uselaws.com

Of counsel

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| RB Rubber Products, Inc., individually and on behalf of all other similarly situated | Norfolk Southern Ry. Co.; CSX Transp., Inc.; Union Pacific RR Co.; BNSF Ry. Co.; and Kansas City Southern Ry. Co. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF       88888 | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) _____ |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Schlichter, Bogard & Denton LLP<br>100 S. Fourth Street, Suite 900<br>St. Louis MO 63102<br>314-621-6115 | |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**● A. Antitrust**

[X] 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)**     **OR**     **○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General**<br>☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment**<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895 Freedom of Information Act**<br>☐ **890 Other Statutory Actions**<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans**<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act**<br>☐ **720 Labor/Mgmt. Relations**<br>☐ **730 Labor/Mgmt. Reporting & Disclosure Act**<br>☐ **740 Labor Railway Act**<br>☐ **790 Other Labor Litigation**<br>☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)**<br>☐ **443 Housing/Accommodations**<br>☐ **444 Welfare**<br>☐ **440 Other Civil Rights**<br>☐ **445 American w/Disabilities-Employment**<br>☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance**<br>☐ **120 Marine**<br>☐ **130 Miller Act**<br>☐ **140 Negotiable Instrument**<br>☐ **150 Recovery of Overpayment & Enforcement of Judgment**<br>☐ **153 Recovery of Overpayment of Veteran's Benefits**<br>☐ **160 Stockholder's Suits**<br>☐ **190 Other Contracts**<br>☐ **195 Contract Product Liability**<br>☐ **196 Franchise** | ☐ **441 Civil Rights-Voting**<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. sec. 1, et seq. Plaintiff claims Defendants engaged in a horizontal price-fixing scheme in violation of antitrust laws.

**VII. REQUESTED IN COMPLAINT**   ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** Excess of $5M   Check YES only if demanded in complaint<br>**JURY DEMAND:**   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  Dec 17, 2007       SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.